# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### SOUTHEASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 1:07CR 110 HEA |
| | ) |
| MUSTAFA REDZIC, | ) |
| | ) |
| Defendants. | ) |

## **REPORT AND RECOMMENDATION**

### **Discovery Motions**

The defendant has filed a number of pretrial motions: Document #28, Motion of

Defendant Redzic for Early Disclosure of <u>Jencks</u> Act Material; Document #29, Motion of

Defendant Redzic for Disclosure of Expert Testimony; Document #31, Motion of Defendant

to Disclose Intent of Government to Use 404(b) Evidence; and Document #32, Motion of

Defendant for Production of Favorable Evidence. The government has either agreed with

the defendant's motion and will provide the requested materials or responds simply that if

any such materials come into the possession of the government, they will be supplied to the

defendant. The above-titled motions will be denied as moot.

The defendant has also filed his Motion to Suppress the Contents of Any Electronic

Surveillance (Document #30), his Motion to Suppress Statements and Evidence (Document

#33) and his Supplement to Defendant's Motion to Suppress Statements and Evidence

(Document #38).

## Motion to Suppress the Contents of Any Electronic Surveillance

The defendant has filed his Motion to Suppress the Contents of Any Electronic Surveillance (Document #30).

The defendant sets out three grounds for his motion. Defendant argues that the Application for Interception of Wire and Electronic Communications failed to establish that non-intrusive investigatory procedures had been unsuccessfully attempted or would be unreasonable or dangerous under the circumstances.

Secondly, the defendant alleges that the electronic interceptions were not made in conformity with the orders of authorization which specified that they be conducted in such a manner as to minimize the interceptions not otherwise subject to the interception order pursuant to 18 U.S.C. § 2518.

Third, the defendant claims that the type of interception utilized by the government in this case went beyond the scope of the application, in that pen register/trap and trace devices were apparently used but were not requested in the application for electronic interception.

## Factual Background

On March 30, 2005, the Honorable E. Richard Webber, United States District Judge, Eastern District of Missouri, entered an order in Case No. 4:05MC00192ERW, authorizing the interception of wire communications occurring over a telephone bearing number (314)583-5333 (target telephone) for a period of thirty days. The application for this order

-2-

was executed by Assistant United States Attorney Michael K. Fagan and was accompanied by an affidavit in support executed under oath by FBI Special Federal Officer (SFO) William McDonough. Monitoring of these telephones began on March 30, 2005. A minimization meeting was conducted and monitoring agents instructed on minimization prior to monitoring. On April 29, 2005, a sealing application was filed and a formal sealing order was issued by Judge E. Richard Webber with respect to the target telephone.

### The Defendant's Claim that the Application for Interception of Electronic Communications Failed to Establish that Non-Intrusive Investigatory Procedures Had Been Unsuccessfully Attempted or Would Be Unreasonable or Dangerous Under the Circumstances

Title 18 § 2518(3) provides that a judge may issue an ex parte order authorizing interception of electronic communications if the judge determines on the basis of facts submitted by the applicant that, among other findings: "(c) normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous."

The government alleges in its application that during the previous four months normal investigative techniques, including undercover operations, physical surveillance, interviews , pen registers, etc. have failed to expose the complete scope of the enterprise and determine the extent of present operations.

Officer McDonough stated in the affidavit that physical surveillance had been relatively unsuccessful due to the nature of the area to be surveilled. He states that no physical meetings between all of the subjects have been observed. Mr. Redzic has been observed at his home and at his business but since the surveillances are limited to the exterior of both premises, no meetings have

-3-

been observed. The surveillances have taken place at various times of the day and night during weekdays and weekends during the prior two months, but obviously they could not reveal the nature, purpose and content of conversations between the defendant and co-conspirators, the affidavit continues. Surveillance has been conducted at places such as restaurants. The affidavit speaks of driving routes taken by the defendant that seem to be defensive against surveillance. Officer McDonough concludes that the defendant's behavior makes physical surveillance of him difficult and likely to jeopardize the entire investigation. McDonough concludes that the defendant's behavior makes successful undetected surveillance of him while driving highly impractical and unduly risks disclosing to the defendant and his co-conspirators that they are under investigation.

At paragraph 87 of the affidavit, Office McDonough reveals why, based on his experience and that of other law enforcement, interviews would not normally be successful. Besides other reasons given by Officer McDonough, many of the witnesses are ethnically Bosnian, whose language skills and comprehension of the laws of the United States may be limited or feigned and there is an ethnic distrust of law enforcement.

McDonough spoke with Assistant United States Attorney Michael Fagan, who has been a prosecutor for thirty years, about possible cooperation of the subjects of the investigation. Mr. Fagan questioned whether these persons would choose to assist the government and further raised the question of the credibility of the testimony in view of the persons' own participation in the allegedly criminal activities. Subpoenas for testimony before a grand jury were discussed with Mr. Fagan, who expressed the opinion that the grand jury process plus non-electronic surveillance tools would probably not be successful in obtaining prosecutable cases of all the individuals involved in the investigation, the thinking being that they would most likely take the Fifth Amendment.

-4-

McDonough spoke with AUSA Fagan concerning records obtained from state authorities and telephone companies, but investigators have concluded that record reviews will not disclose sufficient information to reveal the nature, scope and extent of the criminal enterprise nor even together with non-electronic surveillance evidence, result in successful prosecutions of the most culpable organizers, planners and actors in the criminal scheme.

McDonough related that although there had been a pen register on Mr. Redzic's telephone, obviously, that device does not show the content of conversations nor fully reveal the conspiracy or criminal activities of the subjects. The same thing is true of the toll records for telephone calls.

The affidavit goes into the possible use of search warrants and based on his experience, Officer McDonough, who has been a detective with the St. Louis Police Department for sixteen years and was a Special Federal Officer of the Federal Bureau of Investigation, believes the use of a search warrant would not provide sufficient evidence to determine the full scope of the criminal activity believed to be taking place as described in the affidavit. A search warrant of the residences of Mr. Redzic and the Bosna Truck Driving School and seizure of records could produce additional evidence but would not likely identify or sustain a successful prosecution of all the co-conspirators participating in the identified criminal enterprise. Besides, a search of the residences or other similar contact with any of the above subjects would alert these subjects and as yet unidentified co-conspirators to the existence of the government's investigation, thus, precluding the successful use of additional covert investigative techniques. Searches of the offices of Commercial Drivers Training Academy (CDTA) or the homes of the co-conspirators, in McDonough's experience, would not likely produce sufficient incriminating evidence against other enterprise members and on the other hand would alert those persons involved and increase the risk they would flee, destroy

-5-

evidence, seek to intimidate potential witnesses or otherwise frustrate the investigation.

Contacts with confidential informants have been tried but to date have failed to produce sufficient evidence to prosecute the individuals mentioned in the affidavit. Part of the difficulty arises from the fact that all of the persons who could be used reside within a fairly close knit ethnic community in which violence and retaliation for cooperation with authorities is known to occur. The confidential sources or informants have made it clear that they will not testify and refuse to be put in a position where they believe they might have to testify or will stop giving information to law enforcement officials if they believe their identities may be disclosed. One informant made a telephone call to Redzic but refused to be involved in any further aspect of the investigation.

Undercover agents have produced valuable evidence against CDTA but have not been fully successful in determining the scope of the enterprise nor would the efforts by the undercover operatives enable successful prosecutions against the Bosna Truck Driving School and others involved with the activities. McDonough thought it would be unlikely that they would be able to place an undercover person at the Bosna Truck Driving School because of the close ethnic nature of the enterprise. McDonough continues that because of the closed nature of the enterprise, it is extremely difficult to penetrate it to a level necessary to identify all of the conspirators. It would be unduly time consuming, McDonough feels, especially considering the imminent threat to public safety posed by the criminal activities of the subjects, and would endanger the undercover person as well. A significant proportion of the students transfer the licenses they receive to other states. McDonough alleges the nature of how the Bosnian immigrant community communicates about the fraudulent activities of the Bosna Truck Driving School cannot be reasonably and successfully developed in any other manner than through authorized electronic surveillance. There is no

-6-

evidence, according to the affidavit, that the non-Bosnians, Parr, Crutchfield or Walls, of CDTA would cooperate and approaching them would disclose the existence of the investigation and unduly jeopardize it, as well as jeopardizing the safety of undercover officers who have been at CDTA, and the availability of evidence and testimony more likely to be acquired through court-authorized electronic surveillance.

The affidavit reviews the fact that consensual monitoring provided valuable information but did not identify all the co-conspirators in the enterprise. The product of consensual monitoring to date has been limited in its value. It was the opinion of Officer McDonough that similar consensual monitoring would not likely disclose sufficient admissible evidence to enable successful prosecution of the leaders, managers or organizers of the criminal enterprise.

Deferring prosecution to the State of Missouri was considered, and McDonough felt that would not adequately address the problem. The state proceeding against CDTA would be a Class A misdemeanor. Any action against Bosna Truck Driving School would have to be a civil or administrative action. The Missouri Highway Patrol and the Department of Revenue agreed that premature effort from their respective agencies would not effectively address and would frustrate the attempt to gather evidence to successfully prosecute the exposed crime problem. Further, none of the State of Missouri available enforcement efforts identifies drivers, truck driving schools, third-party testers or possible corrupt public officials. Officer McDonough concludes that normal methods of investigation have been attempted and have failed or reasonably appear likely to fail to fully expose the nature and extent of the criminal activity of the subjects or are too dangerous to employ. Further, Officer McDonough feels that, based on his experience and the experience of other members of the law enforcement community, if there is a premature prosecutive effort or utilization of

traditional overt means of investigation, the extent of the criminal activity and the extent of the threat to public safety posed by the criminal activity would remain unexplored.

As related at length above, all of the investigative techniques described have failed to expose the complete scope of the enterprise and determine the extent of present operations. In United States v. Maxwell, 25 F.3d 1389, 1394 (8th Cir. 1994), the Eighth Circuit found that, "Even if conventional techniques have been somewhat successful, however, a wiretap may still be authorized." The Court also found that, "Officers had not been able to determine from other investigative methods the scope of the suspected conspiracy or to develop enough evidence to successfully prosecute the subjects whom they had identified." Id. Both United States v. Macklin, 902 F.2d 1320, 1327 (8th Cir. 1990), cert. denied, and Maxwell found that § 2518(1)(c)'s necessity requirement is satisfied when normal investigative procedures failed to reveal the scope of the conspiracy and all persons involved.

This court finds that the application established the necessity required by Title 18 § 2518(3) and that the wiretap was properly ordered by Judge Webber.

## Minimization

The defendant alleges that the interceptions were not made in conformity with the order of authorization which specified that they be conducted in such a manner as to minimize the interceptions not otherwise subject to the interception order pursuant to 18 U.S.C. § 2518. The defendant bases this claim on his interpretation of pleadings filed by the government that the interceptions pertaining to the defendant were virtually continuous and uninterrupted and, therefore, violative of the order purporting to authorize the said interceptions. Officer McDonough testified at the evidentiary hearing that all the officers who monitored the conversations were instructed regarding the minimization of interceptions, and they were required to sign the form that is attached

-8-

to Exhibit 4, which is the guideline for the conduct of electronic surveillance of cellular telephone number 314-583-5333. Officer McDonough testified that he and the other officers monitoring the conversations complied with the minimization instructions.

Exhibit 4 at page 3, paragraph 4, sets out the minimization procedures. It states that agents may spot monitor for a reasonable period not to exceed approximately two minutes to determine whether any subject is present and participating in a conversation. If the subject is engaged in conversation, interception may continue for a reasonable time, usually not in excess of two minutes, to determine whether the conversation concerns criminal activities. This spot monitoring may occur as often as is reasonable, but, in any event, at least one minute should elapse between interceptions. If during the spot monitoring it is determined that different or additional individuals are engaged in criminal conversation, the monitoring may continue despite the fact that a named subject is not engaged in conversations until the conversation ends or becomes non-pertinent. If individuals other than the named subjects are participating in criminal conversation, the monitor should continue to monitor and advise the case agent or his supervisor immediately. If a conversation is unclear but may relate to other criminal activities, interception should cease after about two minutes, unless it can be determined within that time that the conversation does, in fact, relate to such other criminal activities in which case interception may continue.

If experience shows that conversations between certain people are invariably innocent, interception of such conversations should be ended sooner. If experience shows that other individuals always discuss criminal activities, a longer interception may be justified.

If privileged conversations are heard, the monitoring agents should inform the supervising agent as soon as practicable who, in turn, will notify the supervisory attorney as soon as practicable.

-9-

It is the job of the supervisory attorney to promptly determine if the conversation is privileged. If privileged, the supervisory attorney will instruct the investigative agency not to disclose the content of the privileged conversation to the other investigative or police agencies and not to conduct further investigation based upon the contents of the privileged conversation. The privileged conversations should be recorded on the original tapes or discs which will be sealed and remain in the custody of the court but should be omitted from any transcripts prepared and not disseminated.

Title 18 U.S.C. § 2518(5) provides that no order entered under that section may authorize or approve the interception of any wire communications "for any period longer than is necessary to achieve the object of the authorization...." The supervising agent bears the initial responsibility for terminating the interceptions. If during the course of the interceptions the supervising agent determines that the communications expected to be overheard are intercepted and recorded, he must terminate further interception and inform the supervisory attorney. Only upon the express authorization of the supervisory attorney is the interception to be resumed once it is so terminated.

As noted earlier, each of the persons monitoring communications signed a statement that he had read and understood the 11-page letter concerning the guidelines.

The government filed three ten-day reports. In the first report, Assistant United States Attorney Michael Fagan related that the telephone number 314-583-5333 was not being monitored 24 hours a day but was being monitored in two shifts from 6:00 A.M. to 3:00 P.M. and from 3:00 P.M. to 12:00 midnight.

On the first day covered by the first report, minimized calls were 134 and represented 17.99% of the calls completed. On the second day, the number of minimized calls were 3 and represented 3.49%. On the third day, 4 calls were minimized, representing 5.41%. On the next day, 15.38% of

the calls were minimized; the next day, 8.16% were minimized; the next day, 14.44% of the calls were minimized; the next day, 20.93% were minimized; and on the last three days, the minimized calls were 31.03%, 24.56% and 34.78%.

The above figures refute the defendant's contention that no minimization of calls took place.

The second 10-day report relates that of the calls completed, minimization took place in 21.21%, 11.67%, 26.67%, 19.15%, 20.93%, 25.32%, 22.22%, 18.67%, 15.38%, 30.77%, for an average of 21.70%.

The third 10-day report sets out the percentage of minimized calls. There were no days when there were not some calls minimized. The average percentage of calls minimized for the period was 14.89% per day.

The evidence shows that each day of the phone interceptions calls were minimized. The defendant's argument that the interception of conversations were virtually continuous and uninterrupted and violative of the order purporting to authorize the interceptions is not supported by the evidence.

## **Interceptions Beyond the Scope of the Application?**

Defendant claims that no mention was made in the application for a touch-tone decoder or a pen register. The application did not request those items because a different application was made before United States Magistrate Judge Terry I. Adelman for a pen register and trap and trace device as shown in Government's Exhibit 12 introduced at the evidentiary hearing. A sealed order was issued by Judge Adelman. Copies of the application and order have been provided to the defendant. This argument of the defendant is without merit.

This court will recommend that the defendant's Motion to Suppress the Contents of Any

-11-

Electronic Surveillance (Document #30) be denied.

## Motion to Suppress Statements and Evidence

The defendant has filed his Motion to Suppress Statements and Evidence (Document #33) as well as his Supplement to Defendant's Motion to Suppress Statements and Evidence (Document #38). The defendant claims that his rights were violated when items were seized as the result of the execution of search warrants at the defendant's place of business and other properties on April 22, 2005, and April 25, 2005. The defendant also claims that statements made by him to law enforcement officers were made in violation of his rights under the Fifth and Sixth Amendments in that said statements were not preceded by administration of the Miranda warnings and, consequently, were not voluntarily made.

## Factual Background

The following statement of facts is drawn from that suggested by the defendant.

On April 22, 2005, at approximately 7:35 A.M., search warrants were executed at the residence located at 3015, 3015-A and 3017 Sidney Street in St. Louis, Missouri, by Special Agents of the Federal Bureau of Investigation, Social Security Administration and Internal Revenue Service. These addresses are owned by the defendant, Mustafa Redzic. Items were seized from both 3017 Sidney Street and 3015-A Sidney Street, but no items were seized from 3015 Sidney Street. The items seized consisted of numerous documents and a sum of United States currency.

On April 25, 2005, a search warrant was executed at 7719 Hall Street in St. Louis, Missouri, at approximately 8:00 A.M. The address on Hall Street is the business premises of Defendant Mustafa Redzic. Twenty-three items of an evidentiary nature were seized by agents and removed from the premises. These items consisted mostly of documents and business records of defendant's

-12-

business.

These search warrants were obtained by federal agents as part of a criminal investigation into alleged activities of the defendant involving his relationship with Troy Parr of Commercial Drivers Training Academy, in the fraudulent acquisition of commercial driver's licenses for Defendant Redzic's students. Defendant Redzic owns and operates Bosna Truck Driving School at 7719 Hall Street in St. Louis, Missouri.

Defendant Redzic was interviewed by federal agents at his residence during the execution of the search warrant on April 22, 2005, and made several statements regarding his truck driving business and his relationship with Troy Parr and Commercial Drivers Training Academy. Defendant was again interviewed by federal agents on April 28, 2005, at his place of business at 7719 Hall Street. During this interview, defendant made several statements regarding the above-stated subjects. On May 19, 2005, defendant was again interviewed at his place of business by federal agents and by Assistant United States Attorney Michael Fagan. During this interview, Redzic was informed by AUSA Fagan of the ongoing criminal investigation into his relationship with Troy Parr and Commercial Drivers Training Academy. During this interview, defendant made several statements regarding these subjects.

In his supplement to his motion to suppress evidence, the defendant added the property located at 4417 Wilcox in St. Louis to the Sidney Street properties and the Hall Street business property as a subject to which his motion to suppress evidence applied.

## **Motion to Suppress Tangible Evidence**

The search warrants issued for 3015-3017 Sidney Street, 7719 Hall Street and 4417 Wilcox in St. Louis, Missouri, used the same affidavit, and the parties agreed that the ruling on any search

-13-

warrant would apply to all of the search warrants.

As his first reason for suppressing the tangible evidence seized, the defendant argues that the search warrant was insufficient because it does not describe with particularity the items to be seized. The defendant claims that the warrant merely states that it is seeking documents prepared in furtherance of mail fraud, bribery, interstate travel or use of interstate facilities in racketeering or the conduct of an enterprise in interstate or foreign commerce through a pattern of racketeering activity but does not describe with particularity the items to be seized.

The court has reviewed the LIST attached to both the affidavit of Officer McDonough and to the search warrant. It would serve no purpose to go through each of the 11 categories of items indicating how specific they are. The parties have the LIST and a copy of the LIST is attached to this report and recommendation. After review of the LIST attached to both the affidavit of William McDonough and the search warrant, the court finds that the LIST and the warrant to which it is appended as an attachment describe with particularity the items to be seized in 11 separate specific paragraphs.

Defendant's contention that the search warrant is insufficient because it does not describe with particularity the items to be seized should be denied.

## **Probable Cause**

The defendant alleges that the affidavit of Officer William McDonough attached to the Application for Search Warrant did not provide United States Magistrate Judge David D. Noce with probable cause for the issuance of the search warrants.

The United States Supreme Court has defined probable cause to search as "a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462

-14-

U.S. 213, 238, 103 S.Ct. 2317, 2332 (1983).

The standard to be used by a judge reviewing the decision to issue a search warrant is different from the standard to be used by the judge who issues the search warrant. As the Supreme Court stated in <u>Gates</u> more fully, <u>Id.</u>:

> The task of the issuing magistrate is simply to make a practical, common sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis for ... conclud[ing]" that probable cause existed. <u>Jones v. United States</u>, 362 U.S., at 271, 80 S.Ct., at 736.

The Supreme Court rejected the prior tests required by <u>Spinelli v. United States</u>, 393 U.S. 410, 898 S.Ct. 584 (1969), finding that "the complex superstructure of evidentiary and analytical rules that some have seen implicit" in the <u>Spinelli</u> decision cannot be reconciled with the fact that many warrants quite properly are "issued on the basis of non-technical, common sense judgments of laymen applying a standard less demanding than those used in more formal legal proceedings." <u>Id</u>. at 235, 2331. The Court offered the following caution to reviewing courts, <u>Id</u>. at 236, 2331:

> Similarly, we have repeatedly said that after-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of <u>de novo</u> review. A magistrate's "determination of probable cause should be paid great deference by reviewing courts." <u>Spinelli</u>, <u>supra</u>, 393 U.S., at 419, 89 S.Ct., at 590. "A grudging or negative attitude by reviewing courts toward warrants," <u>Ventresca</u>, 380 U.S., at 108, 85 S.Ct., at 745, is inconsistent with the Fourth Amendment's strong preference for searches conducted pursuant to a warrant; "courts should not invalidate warrant[s] by interpreting affidavit[s] in a hypertechnical, rather than a common sense, manner." <u>Id</u>., at 109, 85 S.Ct., at 746.

Probable cause is

> a fluid concept--turning on the assessment of probabilities in particular factual contexts--not readily, or even usefully, reduced to a neat set of legal rules. Informants' tips doubtless come in many shapes and sizes from many different types

of persons. As we said in Adams v. Williams, 407 U.S. 143, 147, 92 S.Ct. 1921, 1924, 32 L.Ed.2d 612 (1972): "Informants' tips, like all other clues and evidence coming to a policeman on the scene, may vary greatly in their value and reliability." Rigid legal rules are ill-suited to an area of such diversity.

Gates, 462 U.S. at 232, 103 S.Ct. at 2329.

The Supreme Court found, 462 U.S. at 231, 103 S.Ct. at 2328, quoting from Brinegar v. United States (citation omitted), that the probable cause standard is a "practical, nontechnical conception" and "In dealing with probable cause, ... as the very name implies, we deal with probabilities. These are not technical; they are the factual considerations of everyday life on which reasonable and prudent men, not legal technicians, act."

As the Supreme Court stated in Gates, our review of the sufficiency of the affidavits should not take the form of a de novo review.

The court has reviewed the application and affidavit for search warrant and finds that Judge David Noce had probable cause for the issuance of the search warrants.

The affidavit relates (page 23) that on February 25, 2005, a confidential informant (CI) placed a consensually recorded telephone call to the cellular telephone utilized by the defendant. The call was made completely cold, and the CI acted as an out-of-state resident. The conversation was in Bosnian and Officer McDonough had the conversation translated by a qualified FBI linguist. After the conversation, the CI informed Detective Scott McKelvey and Officer McDonough that Redzic spoke openly at first but then seemed to become "cautious" as the conversation went on.

Although Mr. Redzic had no idea about the caller's abilities, eye sight, or intellectual capability, the defendant clearly indicated that the testing, both written and driving, would be no problem. Mr. Redzic told the CI that he/she will have his/her license in seven days. McDonough

-16-

reported that interviews with the Missouri Department of Revenue employees and the Missouri State Highway Patrol indicate that it's highly unlikely that an untrained driver could obtain a full CDL in only seven days. In the conversation, the defendant told the CI, "You'll get the test to learn." Redzic has "his own instructors and trucks down there," and "people behind the counter." From the fact that Mr. Redzic said he had his own instructors and truck "down there," McDonough believed that the defendant was referring to Sikeston, Missouri, where CDTA is located. The affidavit continues that results of pen register analysis and court-authorized electronic surveillance showed that Redzic had numerous communications with Troy Parr, the Director of Training at CDTA, via his cellular phone.

Sergeant Dan Nash of the Missouri State Highway Patrol stated that on March 1, 2005, the Missouri State Highway Patrol had initiated another independent investigation based on a complaint of fraudulent licensing which revealed that CDTA was also involved in the issuance of CDL's to unqualified students of another truck driving school in St. Louis, independent of Bosna Truck Driving School, the C-1 Truck Driving School (C-1). An undercover Missouri Highway Patrol Trooper (UC) registered to attend classes at C-1. While the trooper was in attendance, the instructors provided the students with the answers to the written portion of the test, as well as ways to cheat on the examinations. The instructors asked the students when taking the written portion of the CDL test, to either write down the questions or use cellular telephone cameras to take pictures of the test questions so that C-1 would have the most recent version of the written examination. After the UC passed the written examination at a Missouri State Highway Patrol/Department of Revenue (MSHP/DOR) facility, the undercover officer was then given the opportunity to take the skills portion (driving test) of the licensing procedure. Rather than conduct the skills test at the Highway Patrol examination facility in St. Louis, the students were taken to CDTA in Sikeston, Missouri. The

-17-

procedure used was substantially identical to that used by the Bosna Truck Driving School in its dealings with CDTA. On the way to Sikeston, the UC expressed his concerns that he would not be able to pass the skills test. The affidavit continues, "The instructor repeatedly stated for the UC not to worry about it and that, even though it is highly illegal, for $50.00, the instructor will fill out the form and the UC will pass the test." The affidavit continues that the UC officer paid the $50.00 and while waiting for his license was confronted by other students who were actually taking the skills test. The UC advised that he paid $50.00 and passed the test, after which the other students began borrowing money from the UC to pay $50.00 to pass the test.

Based on that information, another UC was placed at CDTA who confirmed the original UC's observation that CDTA was providing passing scores on the skills portion of the examination without administering the examination. The second UC noted that groups of persons were coming to CDTA for licensing and on a board in the CDTA office was a listing of different truck driving schools that send students to CDTA. The UC noted Bosna Truck Driving School on the list and had a conversation with one of the instructors about the owner of Bosna Truck Driving School, "Mustafa." The undercover agent observed students from Bosna Truck Driving School being provided CDL examination forms without taking the required skills test. He noted similar activity with students from NuWay and MTC, two other training schools in St. Louis, Missouri. The UC personally observed instructors at CDTA filling out blank DOR 5050 forms that are required to be completed for licensing. This form is presented to the State by the driver upon passing his/her driving test and ultimately allows the driver to obtain the CDL. The UC observed Walls giving driving tests to applicants and later having Parr or Crutchfield fill out the DOR 5050 form because Walls was not authorized to give the test by the State. On another occasion, the UC observed Parr

-18-

leave the school at approximately 10:00 A.M. and return at approximately 4:00 P.M. Parr then filled out DOR 5050 forms for tests he did not administer.

Sergeant Nash of the Highway Patrol stated that on February 4, 2005, the second undercover agent approached a male who appeared at CDTA to get a CDL "so that he could drive a fuel truck for his friend, who was not further identified." From his prayer rug and his repeatedly conducting prayers by himself, the UC assumed that this individual was a Muslim. The UC said this man obtained a passing score on an examination which he did not take and received seemingly-proper accreditation for a hazardous materials license. The UC observed this person obtain his copy of the DOR 5050 form indicating that he had passed the driving portion of the test.

The affidavit continues that on March 1, 2005, Major Jim Keathly of the Highway Patrol explained that he had recently learned that a company entitled P.A.M. Transport from Arkansas received notification from two of their drivers that they obtained their CDL fraudulently. The drivers were requested to perform simple tasks upon returning to P.A.M. from CDTA and advised that they could not complete the tasks due to lack of training. P.A.M.'s counsel was concerned in that P.A.M. employs 200 truck drivers and sent their employees to C-1 and CDTA for training. P.A.M. was charged $6,000.00 per student. P.A.M. complained to both C-1 and CDTA about the practice that they had been informed about.

On the same date, March 1, 2005, Assistant Director of the Department of Revenue Lowell Pearson advised that the two P.A.M. truck drivers have stepped forward and stated that they received fraudulent licenses from C-1 and CDTA.

In the Department's experience, CDTA in Sikeston, Missouri, has an unusually high compliance (passing) rate of testing. CDTA routinely passes approximately 500 persons per month.

In contrast, in the Department's experience, a typical examiner can conduct 4 skills tests per day. The Department of Revenue was concerned about their position with the U. S. Department of Transportation and potential liability in light of the evident fraudulent conduct being perpetrated by persons associated with CDTA. The affidavit continues that Missouri DOR records show that at any given time, CDTA had no more than three individuals certified by the State to give examinations, making it mathematically impossible to legitimately test 500 individuals a month.

The above information from the affidavit of Officer McDonough is sufficient to establish probable cause for the search warrants for the residences and business offices owned by Mustafa Redzic.

The affidavit itself is 41 pages long and contains other information supporting probable cause.

The affidavit refers to information provided by additional sources indicating that Mustafa Redzic, the owner/operator of the Bosna Truck Driving School, located at 7719 Hall Street in St. Louis, Missouri, commonly takes license applicants to various Missouri Department of Revenue Offices and there acts as an interpreter for the applicant while the applicant takes the written portion of the CDL examination. Although the correct answers to the written examination do not appear on the examinations and are supposed to come from the applicant's knowledge, confidential sources advise that Redzic, while acting as an interpreter, relays the correct answers to the applicant resulting in the applicant receiving a passing grade and obtaining a CDL permit. Redzic charges $3,000.00 per license. Once he is paid, Redzic ensures that the student is brought to a "third-party tester" authorized by the State of Missouri in order to perform the driving portion of the CDL examination. The third-party tester can, in addition to administering the CDL test, further test and grant

endorsements on the CDL's such as HAZMAT, TANKER and DOUBLE TRIPLE TRAILER. The sources also advise that Redzic pays the third-party tester sums to pass his "students" without undergoing required legitimate, unbiased testing procedure.

Officer McDonough relates that the sources of the foregoing information are two separate individuals within the St. Louis Bosnian community who have independently provided Officer McDonough information about the criminal activity of Mustafa Redzic and other subjects over a period of nine months. In June and July of 2004, one of the confidential sources (CS) advised that he/she was aware that Redzic was selling CDL's to other Bosnians by acting as an interpreter for the written portion of the testing process and providing the student with the answers. The CS stated that this was common knowledge within the Bosnian community and frequently talked about that "as long as you have the $3,000.00 Redzic can get you a CDL." The source said that he is personally aware of at least four local Bosnians who have received fraudulent CDL's from Redzic. The second CS, who provided information completely independent of the first, corroborated the first CS's information in August of 2004 and stated that Redzic's apparent criminal activities are openly talked about within the Bosnian community. That CS was also aware of at least four local Bosnians (separate from the ffirst CS information) who have, in the manner described, received fraudulent CDL's through Redzic. McDonough comments that to date (over nine months), all the information provided to him by these two individuals has been "deemed reliable." McDonough says that although no arrests have been made based on these two sources of information, intelligence has been collected and has been corroborated through independent investigations and sources. Because of the closeness of the ethnic St. Louis Bosnian community, the information has been used for intelligence purposes because any arrests would most likely reveal the identity of the sources and jeopardize their

-21-

safety.

The affidavit refers to the fact that on January 4, 2005, United States Department of Transportation (USDOT) Investigator Glennon Musial reported to the St. Louis Division of the FBI that the National Joint Terrorism Task Force (NJTTF) had received information that Bosnian refugees in the St. Louis, Missouri, area had obtained counterfeit commercial driver's licenses (CDL). The NJTTF specifically identified Bosna Truck Driving School, 7719 Hall Street, St. Louis, Missouri, owned by Mustafa Redzic.

Also, in late January, 2005, Detective Scott McKelvey of the St. Louis Metropolitan Police Department's Intelligence Division advised McDonough that he had received information from several different sources throughout the St. Louis Bosnian community that Mustafa Redzic, a Bosnian immigrant, was providing Missouri Commercial Driver's Licenses to fellow Bosnians. The affidavit continued that these sources of information have proved reliable in the past for Detective McKelvey, who has worked within the St. Louis Bosnian community for the past four years and has gained the trust of numerous individuals who provide him information on a daily basis. McKelvey stated that he has numerous sources within the St. Louis Bosnian community who have reported to him on a regular basis from Spring 2004 to March 2005 that Redzic is getting Missouri CDL's for unqualified Bosnians. McKelvey stated that he has received this information from five sources during this period of time and all are reliable. McKelvey told McDonough that this is spoken about so openly and freely within the Bosnian community that many have come to accept it as commonplace. McKelvey told McDonough that his sources personally know of at least 25 local Bosnians who have received Missouri CDL's through Redzic in the manner described above over the last three years. McKelvey is regarded as the St. Louis Metropolitan Police Department's

-22-

"expert" on Bosnian affairs, according to the affidavit. The sources have provided information pertaining to Mustafa Redzic to Detective McKelvey over the past year, and McKelvey advised McDonough that the information provided has been truthful and reliable. McKelvey then related information to McDonough derived from his sources similar to what the undercover agents who had enrolled in the driving school had previously revealed.

The affidavit also refers to public documents registered with the Secretary of State of Missouri showing the Registered Agent for the Bosna Truck Driving School as Mustafa Redzic, 7719 Hall Street, St. Louis, Missouri, with the listed residence of 3017 Sidney Street, St. Louis, Missouri. Public source data bases indicated, upon McDonough's investigation, that Mustafa Redzic is associated with two addresses within the City of St. Louis. Redzic lists 3015-A Sidney as his residence on his Missouri driver's license, a CDL. According to the City of St. Louis Assessor's Office, 3015-17 Sidney is owned by Mustafa Redzic. Another address associated with Redzic is 7719 Hall Street, St. Louis, Missouri.

McDonough conducted a computerized search of the State of Missouri Department of Revenue for persons obtaining commercial driver's licenses. He determined that 275 individuals utilize the address of either 3015-17 Sidney Street or 7719 Hall Street on their Missouri commercial driver's licenses. Of these 275 licenses, 127 have hazardous materials endorsements. Officials with the Missouri Department of Revenue advise it is highly unusual for this many people to utilize the same address on their CDL. Elsewhere in the affidavit it is explained that, under federal law, persons seeking CDL's must apply in their state of residence unless that state does not have standards which meet the government requirements. If that is the case, they may apply in a state which meets the government requirements. McDonough comments that the evident practice of falsely listing as

-23-

residence domicile addresses that are not, in fact, the applicants' residence domiciles supports the investigation's findings that people listing one of these addresses as their residence are doing so fraudulently and are evidently acting, at least in part, at the direction of Redzic, who controls the addresses used through his ownership of these buildings.

McDonough continues that another comparison made of the list of 275 names indicates that 125 of the individuals have, after receiving a Missouri CDL, surrendered their licenses to other states. The affidavit continues that it is believed by investigators that these subjects obtained fraudulent Missouri CDL's with the help of Redzic, then returned to their original state of residence and surrendered their licenses to those states, receiving in return a valid CDL from that state which, in issuing a new CDL, relies upon the purported validity of the Missouri CDL surrendered. Many of the licensing records pertaining to these addresses show the licensee got a Permit and then CDL within days, sometimes hours, of each other. This is highly unusual, as state licensing regulators and investigators advise that in their experience many legitimate truck driving schools require the student to attend a two-month school prior to taking their driving test.

The court could continue reviewing the affidavit, which is replete with information supporting probable cause, but this section of this Report and Recommendation is already too long, the parties have the affidavit and information already provided in this section of this report show probable cause for the issuance of the search warrants.

This court finds that the information supplied in the affidavit to Judge David D. Noce provided "a fair probability that contraband or evidence of crime [would] be found in a particular place." Gates, 462 U.S. at 238, 103 S.Ct. at 2332. Consequently, this court finds that the search warrants in question were issued based on probable cause.

-24-

## Defendant's Statements

In his Motion to Suppress Statements and Evidence, the defendant relates that during the execution of the search warrant at the defendant's residence on April 22, 2005, the defendant was interviewed by federal agents regarding his truck driving business and his relationship with Troy Parr of Commercial Driving Training Academy. The defendant was interviewed again by federal agents on April 28, 2005, at his place of business at 7719 Hall Street regarding the same subjects. On May 19, 2005, the defendant was interviewed a third time at his place of business by federal agents and by an Assistant United States Attorney. During the third interview, the defendant was informed by AUSA Mike Fagan that he was a target of a criminal investigation of his alleged activities involving bribery, as well as mail and wire fraud.

The defendant states that, prior to all three interviews of the defendant, the defendant was never informed of his Miranda rights, that he was not required to answer any questions or that he was free to terminate the interviews at any time. The defendant concludes in his motion that any and all statements made by defendant should be suppressed because they were obtained in violation of his Miranda rights.

In response, the government quotes Thatsaphone v. Weber, 137 F.3d 1041, 1044, in which the Eighth Circuit held:

> "Miranda warnings are due only when a suspect interrogated by the police is 'in custody.'" Thompson v. Keohane, 516 U.S. 99, 102, 116 S.Ct. 457, 460, 133 L.Ed.2d 383 (1995). In determining whether an individual was in custody, a court must examine all of the circumstances surrounding the interrogation, but the ultimate inquiry is simply whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." Stansbury v. California, 511 U.S. 318, 322, 114 S.Ct. 1526, 1528-29, 128 L.Ed.2d 293 (1994) (quotations omitted).

With respect to the concept of custody, Thatsaphone quoted further from Oregon v.

Mathiason, 429 U.S. 492 (1977), 97 S.Ct. 711:

> Any interview of one suspected of a crime by a police officer will have coercive
> aspects to it...But police officers are not required to administer Miranda warnings
> to everyone whom they question. Nor is the requirement of warnings to be
> imposed simply because questioning takes place in the station house, or because
> the questioned person is one whom the police suspect. Miranda warnings are
> required only when there has been such a restriction on a person's freedom as to
> render him "in custody." It was that sort of coercive environment to which
> Miranda by its terms was made applicable, and to which it is limited.

Thatsaphone, 137 F.3d at 1044-45.

As the Thatsaphone case explains, the question of custody is determined after examining

all the circumstances surrounding the interrogation, "The ultimate inquiry is simply whether

there [was] a formal arrest or restraint on freedom of movement of the degree associated with a

formal arrest." Officer McDonough testified at the evidentiary hearing on the pretrial motions

that when the officers went to serve the search warrant on the building numbered 3015, 3015-A,

3017 and 3017-A Sidney, they encountered Mr. Redzic who answered the door at 3017 Sidney.

After about thirty minutes, while the search warrant was being executed, Officer McDonough

informed the defendant that McDonough wished to discuss the subject of the search warrant and

the criminal investigation with Mr. Redzic. During the search, Redzic, his wife and a small child

remained in the front room, the living room area of 3017 Sidney. McDonough asked Redzic if

he would want to speak in private out of the presence of his family and Redzic indicated that he

would. So McDonough and Redzic went to 3015 Sidney, which was being rehabilitated and was

quiet. Both McDonough and Redzic were standing since there was nowhere to sit. Mr. Redzic

appeared to be calm and able to understand what McDonough was saying to him and in reacting

to McDonough's questions. Mr. Redzic was not placed in handcuffs. The officers executing the warrant would have had on some type of raid jacket or outer wear indicating that they were law enforcement, but they were not in uniform. No weapons were drawn on Mr. Redzic nor were they out of their holsters. Special Agent Tim Heppermann of the FBI was also present during the interview with Mr. Redzic. The interview lasted between a half hour and 45 minutes. McDonough's questions related to the investigation into the truck driving school. Mr. Redzic answered the questions, but he denied any knowledge of what the officers thought the investigation was leading to. Redzic claimed to be innocent and to be a legitimate businessman. No one screamed at Mr. Redzic. McDonough characterized the conversation as a fairly cordial or civil conversation. After the conversation, Mr. Redzic was not taken into custody or placed under arrest on any charges. Mr. Redzic escorted the officers to the locked garage and allowed the officers to view the defendant's vehicles parked in the garage. Mr. Redzic volunteered to allow the officers to open up the doors and to look at the cars in the garage. Mr. Redzic actually unlocked the doors. After that, Mr. Redzic was allowed to go back and sit with his family. He was not arrested on any charge, whether federal or state. He was never placed in handcuffs at any time that day. He was not taken down to the Police Department for further questioning.

The second interview took place on April 28, 2005, six days after the search warrant was executed. McDonough had contacted Redzic by phone to set up the interview and Redzic was going to come to the FBI Building and sit down and talk on the 28th. However, Mr. Redzic indicated that he was not comfortable doing that, that he would rather talk with the officers at his place of business on Hall Street. McDonough called Redzic on Mr. Redzic's cell phone, which was the subject of the wiretaps discussed previously in this report.

The interview on April 28, 2005, took place in Mr. Redzic's office. The office had a desk with a chair behind the desk, and McDonough remembered that possibly Mr. Redzic had brought in two chairs for Agent Heppermann and McDonough to sit on. Redzic closed the door, and the interview took place. The interview was civil. The officers were in street clothes. There was no screaming or threats made to Mr. Redzic. Mr. Redzic was not in handcuffs. At the conclusion of the conversation, Mr. Redzic was not taken into custody for any state or federal charge. The officers did not draw their weapons, point their weapons at Mr. Redzic or make any other threats to Mr. Redzic. The weapons were completely concealed during the interview. The interview lasted between a half hour and 45 minutes. Mr. Redzic persisted in his position that he was a legitimate businessman, that he did send his students down to the particular testing facility in Sikeston, but that Redzic had no reason to believe that there was anything improper about that.

McDonough stated it would have been Mr. Redzic's prerogative to interrupt the interview to take a telephone call or go to the men's room, if he wanted to. Mr. Redzic was never told that he was to stay in the interview room until the conversation was concluded. The same thing was true of the earlier interview on April 22. On that date, Mr. Redzic had not asked to be excused or to tend to some other business.

The third interview took place on May 19. Officer McDonough contacted Mr. Redzic and asked if he would speak again with the officers. The set-up in the Redzic office was similar to what it had been on April 28. The interview took place in the office, he sat behind a desk and the officers were given chairs to sit on. Besides Special Agent Heppermann, a Deputy United States Marshal and Assistant United States Attorney Mike Fagan were present. The interview was a civil meeting in which no one raised their voice and people could excuse themselves or

-28-

terminate the meeting if they chose to do so. The meeting was about the same length as the earlier meetings, half hour to 45 minutes. McDonough testified that it would have been Mr. Redzic's prerogative to excuse himself if he wished to do so. At the end of the interview, Mr. Redzic was not placed under arrest, taken to the police station or anything of that nature. No guns were drawn on Mr. Redzic or flourished; in fact, they were all concealed at all times. The purpose of this third meeting was so that Mr. Fagan could lay out the evidence against Mr. Redzic in an attempt to convince Redzic to speak with the officers. Between the second and third meetings, members of the task force had had a conversation with Troy Parr, and the officers set up the meeting with Redzic to let him know what Troy Parr had said about the case. The hope was that when Redzic understood what the evidence was against him, he would be willing to discuss the case and perhaps cooperate with the officers. Mr. Redzic basically persisted that he was in the main, a legitimate businessman, and there was really nothing wrong with what he did.

On cross-examination, Officer McDonough testified that the first interview took place at 3015 Sidney, which was under renovation and was the most secluded, quiet spot they could find. Mr. Redzic was advised that he was the target of the investigation which caused the search warrants to his residence and business to be issued. McDonough testified that he did not recall if the officers specifically told Redzic that he did not have to talk to them if he did not want to talk to them. The officers requested that he speak to them when he was in the presence of his wife and child at 3017 Sidney. Redzic said he would, and then they asked him if he would prefer to do that in private and he told the officers, yes, he would. That is when they went next door to 3015 Sidney. The cross-examiner told Officer McDonough that the cross-examiner was not

-29-

going to ask McDonough if Redzic was free to leave because Redzic was in his own house, and then the attorney asked if that was right. McDonough replied, "Correct." McDonough did not believe he ever told Redzic that he could talk to a lawyer or call an attorney if he wanted to. When asked if he made it clear to Redzic that Redzic had a choice of whether Redzic wanted to talk to McDonough or not, McDonough replied,

> We basically just asked him if he wanted to talk to us, that we had some questions we wanted to ask him, and we wanted to tell him about the search warrant. He said that he wanted to talk to us. We then asked if he would prefer to do that in private, and he indicated that he would.

> Mr. Redzic was not threatened with jail or that he was going to jail.

With respect to the second interview, the plan originally was that it take place at the FBI office, but later, in the telephone call with McDonough, Mr. Redzic stated he was uncomfortable coming to the FBI Building. McDonough stated that that would be fine. Redzic said he would be willing to talk to the officers at his place on Hall Street. At no time during the interview did Mr. Redzic indicate that he did not wish to talk to the officers. During the third interview, Mr. Redzic was told by AUSA Fagan that he was suspected of being involved in criminal activity, specifically bribery, mail and wire fraud involving himself and Troy Parr. He was told that right at the beginning of the interview. Mr. Redzic was never informed of the Miranda warnings during any of the three interviews. The third interview consisted of Mr. Fagan laying out what was going on, what the government had and very few questions were asked of Mr. Redzic. The actual interview was ended by Mr. Fagan telling Mr. Redzic to get an attorney.

The court finds that the defendant, when interviewed on April 22, April 28 and May 19, 2007, was not in custody and, therefore, it was not necessary that he be given the Miranda

warnings. The interviews all took place either at his home or at his place of business. He agreed to the interviews and, in fact, asked that the first interview be in a private place apart from his wife and children and that the other interviews be at his place of business. The arrangements in Mr. Redzic's office were normal. There were no threats of any kind offered to Mr. Redzic. He was not handcuffed; nor were any weapons drawn at any time.

At the conclusion of the interviews, the defendant was not charged with any crime; he was not arrested; he was not brought down to FBI office nor the U. S. Attorney's office nor the task force's office.

The Thatsaphone case referred to Oregon v. Mathiason, supra, in which the Supreme Court found that the defendant was not in custody. Thatsaphone, speaking of the Supreme Court, stated, "Because defendant came to the brief meeting voluntarily, was not arrested, and left without police hindrance, the Court concluded that he had not been subjected to custodial interrogation." 429 U.S. at 494, 97 S.Ct. at 714. In our case, as in Mathiason and Thatsaphone, the defendant gave the interview voluntarily, was not under arrest, was not hindered in any way, was in familiar environments of his own choosing and was subject to no threats. There was no necessity that Redzic be given the Miranda warnings before the interviews. Thatsaphone at 1044.

On the question of voluntariness, the Thatsaphone court quoted from Colorado v. Connelly, 479 U.S. 157, 167, 107 S.Ct. 515, 522 (1986): "Coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." Thatsaphone, 137 F.3d at 1046. This court finds that there was no coercive police activity exerted on Mr. Redzic. The court finds that his

statements during all three of the interviews were voluntary and are admissible in evidence.

The defendant's Motion to Suppress Statements and Evidence should be denied.

**IT IS, THEREFORE, ORDERED** that the discovery motions, Motion of Defendant Redzic for Early Disclosure of <u>Jencks</u> Act Material (Document #28), Motion of Defendant Redzic for Disclosure of Expert Testimony (Document #29), Motion of Defendant to Disclose Intent of Government to Use 404(b) Evidence (Document #31) and Motion of Defendant for Production of Favorable Evidence (Document #32), be denied as moot.

**IT IS, THEREFORE, RECOMMENDED** that the defendant's Motion to Suppress the Contents of Any Electronic Surveillance (Document #30), defendant's Motion to Suppress Statements and Evidence (Document #33) and his Supplement to Defendant's Motion to Suppress Statements and Evidence (Document #38) be denied.

The parties are advised that they have eleven (11) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(l), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. <u>See</u> <u>Thompson v. Nix</u>, 897 F.2d 356 (8th Cir. 1990).

LEWIS M. BLANTON
United States Magistrate Judge

Dated this 6th day of December, 2007.

-32-

I. Books, records, receipts, notes, ledgers (including computer software) and other business related documentation relating to the training/testing for and/or assisting in the procurement of commercial drivers' licenses (CDL's) and/or hazardous materials or other specialized driving authorizations;

II. Papers, tickets, notes, schedules, receipts and other items relating to domestic and international travel, including, but not limited to, travel to and from the metropolitan St. Louis area and elsewhere;

III. Address and/or telephone books and papers or electronic storage. including cellular telephone memory, reflecting names, addresses, and/or telephone numbers of associates and/or co-conspirators involved in the perpetration and furtherance of mail fraud, bribery, interstate travel or use of interstate facilities in racketeering, or the conduct of an enterprise in interstate or foreign commerce through a pattern of racketeering activity;

IV. Books, records, receipts, pay stubs, employment records, bank statements and records, money drafts, letters of credit, money order and cashier's checks receipts, passbooks, bank checks, tax records, and other items evidencing the obtaining, secreting, transfer and/or concealment of assets and the obtaining, secreting, transfer, concealment and/or expenditure of money;

V. United States Currency and financial instruments;

VI. Photographs, in particular photographs of co-conspirators, of associates-in-fact, of assets, and/or documentation prepared in furtherance of the crimes described in III, above;

VII. Indicia of occupancy, residency, rental and/or ownership of the premises described above, including, but not limited to, utility and telephone bills, canceled envelopes, rental or lease agreements, keys and real estate documents;

VIII. Computers capable of digitally storing the above records and items, or information about the above items, as well as disks, tapes, hard-drives or electronic storage media having similar storage capabilities;

IX. Electronic and/or hard copies of the State of Missouri commercial driver's license written tests, photographed copies of original State of Missouri commercial driver's license written tests, and/or reproduced questions of the State of Missouri commercial driver's license written tests questions and corresponding correct answers and/or the Bosnian language-translated equivalent;

X. Records of all students who have attended courses of study, or purported testing, at any of the training facilities (and/or other training facilities that may be on-site) known as, or associated with, Bosna Truck Driving School and/or Commercial Driver's Training Academy;

XI. Records of participation in licensing procedures for the preparation, processing and issuance of State of Missouri commercial driver's licenses to include the Missouri Department of Revenue, form 4080 tilted, "Third Party Tester Monthly Report," the Missouri Department of Revenue, form 5050 titled, "Third Party Tester Commercial Driver License Examination Record," and any other documentation prepared in the normal course of business that may support the issuance of a commercial driver's license by the State of Missouri.

2